UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-21089-CIV-ROSENBAUM/SELTZER

J.G.,

      Plaintiff,

v.

CARNIVAL CORPORATION, d/b/a
CARNIVAL CRUISE LINES, INC.,

      Defendant.
_____/

## ORDER ON MOTIONS FOR SANCTIONS

This matter is before the Court upon Defendants' Amended Motion for Sanctions [D.E. 220]. The Court has reviewed the Motion, all supporting and opposing filings, and the record in this case and is otherwise fully advised in this matter. For the reasons set forth below, the Court denies the Motion for Sanctions.

### *I. Background*

This case arises out of events that allegedly took place while Plaintiff J.G. was a seventeen-year-old passenger on Defendant Carnival Corporation's cruise ship *Sensation* in April 2011. D.E. 16. Specifically, Plaintiff brought negligence and direct-liability claims against Carnival for an interrogation and search, including an alleged strip search, of Plaintiff, in response to accusations that Plaintiff illicitly brought marijuana onboard the vessel. *Id.* In the First Amended Complaint, Plaintiff alleged liability based on Carnival's own negligence, as well as based on the conduct of Carnival's employees. *Id.*

During the course of the litigation, Plaintiff had several opportunities to explain the events that precipitated her filing of this lawsuit. Aside from the pleadings in this case, Plaintiff produced

a written statement that she authored. In this statement, she gave the following account of the events in the early-morning hours of April 27, 2011:

> Around 2:00 a.m. . . . , I got on the elevator with my friend K.[B.], my mom, a male friend of my moms [sic] and an unknown man, later identified as a security guard. We were all coming back to the ship after being at the bar, Senor Frogs, not far from the ship. The security guard, a few minutes after we got on, picked up a very tiny baggie of what looked like marijuana and asked if it was mine. I did not respond. He told me to let him see my room card. I showed it to him and all four of us got off of the elevator. Not sure if the security guard got off or not. My mom and her friend escorted us back to our room
>
> Never did the security guard see me have possession of the week he picked up off of the floor of the elevator. It was on the floor, it could have been any ones [sic]. I just so happened to be standing next to where he found it.
>
> Later, K.[B.] and I were about to leave our room when we walked outside and saw the female security guard and two other male security guards at my mom's room door. They then came over to me and said they were going to search my room. The man searched my room and kept accusing me of having more weed. I kept telling them I didn't have any weed and they kept insisting that I did. They told me to take my clothes off (my underwear) because they didn't believe me. The female security guard stooped down to take a close look at my private area and told me to spread my legs. The two male security guards stood there looking at me. My friend was over in the corner crying and scared. I felt violated, humiliated, embarrassed and traumatized. My mom was not there. They couldn't find her. My friend K.[B.] was witness to the events in the room. My Aunt, Barbara Potter, was awakened by security. She came to the doorway and saw me standing there with my dress up with no panties on and the female security guard check out my private area. They kept badgering me to say the weed was mine, tell the truth, tell the truth and we'll let you go. They said if you say it's yours, we will let you go back to your cruise. I said the weed was mine. They lied.
>
> There was an incidence of the female security guard escorting me into the restroom to remove the tampon. The exact details of which room this occurred in is sketchy. I can't remember. My aunt and K.[B.] might be able to recall the details of this.
>
> After that, I was allowed to put my panties back on and was escorted

> down stairs to an interrogation room, leaving my best friend alone, crying and scared. Later, Leticia, the female security officer, let me go back to the room to change my clothes, grabbing my arm tightly so I wouldn't get out of her site [sic]. Then back down stairs to the interrogation room. My mother arrived. Again, they said tell us the weed is yours and we will let you go back to your room. With the promise they kept telling me of letting me go back to my room and the nightmare would be over, I said yes, the weed is mine. Then they asked where I got it from. I said I brought it from the states. They said I was lying. They wanted to know who I bought it from I Nassau. I again said I brought it from the states. I was told I was under arrest for possession of a dangerous drug. They made me sign Permission to Land Guest form. The Bahamian police were there. My mom was allowed to go to her room and pack a bag quickly as they made her leave the ship also. They kept rushing her. They escorted us to a car outside and took me to jail. . . .

D.E. 220-2. During her deposition on October 5, 2012, Plaintiff testified that "everything in [her] statement was] completely true and accurate." *See* D.E. 220-3 at 126:21 - :23.[1]

By the time of trial, Plaintiff had reached the age of nineteen. Her trial testimony differed from her written statement and deposition testimony in some significant ways. Among other such differences was Plaintiff's explanation for why she removed her clothes and her tampon. In Plaintiff's earlier versions of her story, she stated that Defendant's employees instructed her to remove her underwear and her tampon. But during her trial testimony, Plaintiff stated that no one told her to remove these items and that she did it herself "voluntarily," in one version of her trial testimony, so Defendant's confrontation of Plaintiff regarding her possession of drugs on the *Sensation* "would be over with":

> Q:   So after — talk the jury through and myself, please, after the sheets were tossed, what happens [sic] after that?

---

[1]Some documents in the record bear more than one page number: the document's original page number and the page number imprinted across the top of the page by the Court's CM/ECF filing system. References to page numbers in this report refer to the CM/ECF page number except where, as with this particular document, the document is part of a transcript. In that case, the cited page number is the original page number of the document, and the line number follows the colon.

A: I'm not sure if Leticia pat me down or not. I don't remember that part of it. I just remember her telling me you have more, you need to show me. She asked me to lift my dress up. I lift [sic] my dress up. She still wasn't satisfied with that answer, telling me that she knows I'm hiding more weed. So I pulled my pants down, and I took my tampon out to show her that I didn't have any [more] weed.

\* \* \*

Q: You pulled out your tampon. Why did you pull out your tampon?

A: [S]he just made it seem like that's what I had to do to show her that I didn't have any more marijuana.

Q: Okay. And did she actually ask you and tell you to take out your tampon?

A: No.

\* \* \*

Q: Why did you lift up your dress?

A: She asked me to.

Q: Why did you take out your tampon?

A: It was inferred [sic] to do that.

Q: Inferred [sic] how?

A: Inferred [sic] that if I didn't, then I was going to get in more trouble for not showing that I didn't have any more weed.

\* \* \*

Q: Were you voluntarily [taking your tampon out], in your opinion?

A: Yes.

Q: Okay. Voluntarily, why?

A: So it would be over with.

\* \* \*

Q: So the jury is completely clear about this, you lifted your dress up, correct?

> A: Yes.
>
> Q: And you were wearing underwear when you did so, correct?
>
> A: Yes.
>
> Q: And you claim that Leticia told you to remove your underwear, correct?
>
> A: It was implied.
>
> Q: She never actually used the words, "Take off your underwear," did she?
>
> A: No.
>
> Q: Same way she never actually used the words, "Take your tampon out," correct?
>
> A: No.
>
> Q: Those were things you did on your own, correct?
>
> A: I felt I had to do it.
>
> \* \* \*
>
> Q: Is [your written statement] not truthful?
>
> A: There's some parts that are truthful, and there's some parts that are not truthful.

D.E. 220-4 at 12:2 - 50:22.

Following the five-day trial, the jury returned a verdict for Defendant on all counts of the First Amended Complaint. *See* D.E. 217. Defendant's Amended Motion for Sanctions [D.E. 220] followed. In its Amended Motion, Defendant complains that Plaintiff's "lies not only caused Carnival to expend a significant amount of money defending itself against her frivolous claims, but they ultimately wasted this Court's time, as well as the time of the jury." *Id.* at 1. Defendant further charges that Plaintiff's conduct in prosecuting this lawsuit "has jeopardized the careers and livelihood of Carnival's employees that have done nothing but discharge their duty in an exemplary

fashion. Plaintiff would destroy their names and reputation all in an attempt to seek revenge against Carnival for disembarking her off the cruise for her own illegal conduct." *Id.* at 6. Accordingly, Defendant asks this Court to sanction Plaintiff by requiring her to pay the entire cost of Defendant's defense of the action, including all attorney's fees and costs. *Id.*

For her part, Plaintiff responds that any contradictions or inconsistencies between her pretrial statements and trial testimony — which Plaintiff admits do exist — are insufficient to warrant sanctions. D.E. 224 at 12-13. In any event, Plaintiff further claims that, given her financial situation, she has a complete inability to pay the sanctions sought by Defendant. *Id.* at 13.[2]

## *II. Discussion*

Courts possess certain implied powers that are necessary for the court to exercise its institutional functions. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (citations omitted). This inherent authority includes the power to sanction litigants who act in bad faith, and the key to invoking this authority is a finding of bad-faith conduct. *See Byrne v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S.

---

[2] Plaintiff also devotes significant portions of her briefs to insinuating that Defendant's counsel has acted improperly based on a letter that Defendant's counsel sent Plaintiff's counsel after Plaintiff completed her testimony during the trial. In this letter, Defendant's counsel stated that "it is clear that Plaintiff's claim is a fraud upon the court and that Plaintiff has repeatedly perjured herself in the course of these proceedings." D.E. 224-1. Defendant then demanded that Plaintiff dismiss her claim with prejudice before the continuation of trial the following Monday morning, or Defendant would seek sanctions. *Id.* In her brief Plaintiff characterizes Defendant's letter as threatening to pursue perjury claims against Plaintiff. *See, e.g.,* D.E. 224 at 2-3. In fact, however, the letter did not threaten criminal charges against Plaintiff but instead warned Plaintiff's counsel that Defendant intended to "seek sanctions pursuant to the District Court's inherent authority" if Plaintiff failed to dismiss her claim with prejudice. This is a civil remedy that Defendant's counsel stated it would seek, not an impermissible threat of criminal prosecution to derive an advantage in civil litigation. In addition, Plaintiff asserts that Defendant's witnesses may have lied during their testimony. But even assuming, *arguendo*, that they did — a charge that is certainly not objectively demonstrated regarding any material matter — such a circumstance would not relieve Plaintiff of responsibility for engaging in any bad-faith litigation.

639 (2008); *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). Due to their potency, though, a court's "inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.

Bad-faith conduct can be demonstrated by a party's knowing or reckless raising of a frivolous argument, by a party's harassment of an opponent, by a party's delay or disruption of a proceeding, or by a party's hampering of the enforcement of a court order. *Byrne*, 261 F.3d at 1121 (citing *Barnes*, 158 F.3d at 1214). In evaluating whether a particular claim is frivolous, a court "must focus on the question of whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Sullivan v. Sch. Bd. of Pinellas Cnty.*, 773 F.2d 1182, 1189 (11th Cir. 1985) (internal quotations and citation omitted) (discussing when fees can be awarded to a defendant faced with a frivolous civil-rights complaint); *cf. Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1180 (11th Cir. 2005) (equating the standard of frivolity in civil-rights fee shifting cases with the finding required to impose sanctions under the court's inherent powers).

This case presents a close question as to whether Plaintiff engaged in bad-faith conduct warranting the imposition of sanctions. On the one hand, Plaintiff's case lacked any substantial factual basis. Although Plaintiff no doubt felt anxiety at being questioned by Defendant's security employees, she found herself in that position because she knowingly violated Defendant's policies and the law when she brought an illegal drug onboard the *Sensation*. And, while Plaintiff's conduct certainly did not give Defendant free reign to do whatever it wished in investigating Plaintiff, Plaintiff testified at trial that the aspects of her interrogation over which she sued were either her idea or did not happen.

For example, while Plaintiff alleged in her pleadings and her earlier statements that

Defendant's employees conducted a coercive strip search of Plaintiff, she testified at trial that no one instructed her to remove her panties and that she voluntarily took them off. Similarly, whereas Plaintiff claimed in her earlier statements that she was instructed to remove her tampon, she revealed at trial that doing so was her own idea and that she did it so the confrontation regarding Plaintiff's possession of drugs on the *Sensation* "would be over with."

It is true, as Plaintiff suggests in her briefing, that Plaintiff contended elsewhere in her testimony that she "had to" remove her underwear and her tampon and that the direction to remove these items was implied. But significantly, she later clarified that the compulsion she claimed to feel stemmed from her fear that she would be removed from the cruise because Defendant's employees discovered that she possessed marijuana onboard, not because she was concerned about physical retribution of some type. *See* D.E. 220-4 at 61:4 - :8. Moreover, Plaintiff's admission during her testimony that she did these things to expedite the resolution of Defendant's investigation into Plaintiff's possession of marijuana contradicts her assertions that she removed her clothing and tampon because Defendant's employees implied that she must. In short, contrary to Plaintiff's allegations in her First Amended Complaint and earlier statements that Defendant's employees forced her to submit to a strip search, Plaintiff's trial testimony demonstrates that Plaintiff herself chose to remove her clothes and her tampon in her own misplaced effort to avoid being removed from the remainder of the cruise as a result of her possession of marijuana.

Other aspects of Plaintiff's case are likewise troubling. For instance, although Plaintiff complained that Defendant's employees caused her "immediate apprehension of invasive, unwanted physical contact and assault," that they engaged in "unwanted physical contact with Plaintiff," and that they "sexually exploit[ed] her," D.E. 16 at ¶ 61, no evidence that any of these things occurred

was presented during trial.[3] Nor did Plaintiff present any evidence that Thapa, Yuzon, and Leticia sexually harassed her, as alleged in Count IV of the First Amended Complaint. *See* D.E. 16 at 12-13. As for Plaintiff's contention that Leticia stooped down to "take a close look at [Plaintiff's] private area," during trial, Plaintiff admitted that she did not remember that occurring. *Id*. at 62:13 - :20.

All of these allegations are quite serious, and, noting that during her trial testimony, Plaintiff herself described some of her earlier claims as "not truthful," Defendant understandably seeks recompense for having to defend against these meritless accusations. These facts tend to support a finding of bad faith.

On the other hand, in the Eleventh Circuit, "false statements alone do not indicate bad faith. Without a 'smoking gun' statement from the plaintiff, *i.e.*, 'I know my claim is frivolous and I am pursuing this claim to harass the defendants,' a district court makes a determination of bad faith by drawing inferences from the conduct before it." *Byrne v. Nezhat*, 261 F.3d 1075, 1125 (11th Cir. 2001), abrogated on other grounds by *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146 (11th Cir. 2011). Therefore, the Court must consider the other aspects of the record in determining whether the imposition of sanctions is warranted in this case. The Court concludes that the record as a whole does not support the notion that Plaintiff pursued this lawsuit for the purpose of harassing Defendant.

Plaintiff was seventeen years old when the incident of which she complained occurred, and she was plainly scared that she might face criminal charges, that she might be thrown off the ship

---

[3]Plaintiff did testify that Leticia held her arm as she walked Plaintiff to security. *See* D.E. 220-4 at 52:13 - :18. But Plaintiff did not suggest in any way that Leticia forcibly held Plaintiff's arm or that Leticia in any way hurt Plaintiff while holding her arm. Moreover, that was the only testimony that Plaintiff gave regarding any touching of any type by any employee of Defendant, and Plaintiff admitted that she was still drunk at the time that Leticia held her arm as she walked to security. *See id*. at 52:24 - :25. As for other evidence of touching in the record, while Leticia testified that she conducted a pat down of Plaintiff while Plaintiff was dressed, Plaintiff did not testify that Leticia engaged in any impropriety in executing the pat down, nor did Plaintiff address the pat down at all during her testimony.

mid-cruise, and that she might be in deep trouble with her mother. Plaintiff was also intoxicated when Defendant's employees confronted her about the marijuana that she brought onboard the ship. Under no circumstances does this Court in any way excuse Plaintiff's conduct. In fact, the Court condemns it in the strongest of terms. Nevertheless, the circumstances that Plaintiff found herself in do provide some insight into how Plaintiff's original version of events developed.

In addition, the end result of Plaintiff's marijuana incident was that she and her mother were, in fact, kicked off the cruise before it ended and while the ship was still in the Bahamas. Once Plaintiff told her mother her story about how that turn of events came to be, her mother appears to have encouraged Plaintiff to pursue her legal claim. Although Plaintiff had attained legal age as of the time that she filed this lawsuit, she was only eighteen years old and apparently still very much subject to the influence of her mother.

Significantly, however, and in sharp contrast to Plaintiff's dealings in this case prior to trial, during trial, Plaintiff admitted that parts of her prior statements had been "untruthful." She set the record straight regarding the facts that none of Defendant's employees instructed her to remove her clothing or her tampon and that none of Defendant's employees assaulted or battered her in any way. And she did this presumably with knowledge that her trial testimony would likely doom her case. While Plaintiff obviously should not have filed her claim in the first place and, having filed it, should have come forward far earlier than she did with an accurate account of what had actually occurred onboard the *Sensation*, the Court recognizes that Plaintiff did correct her prior statements through her trial testimony.

Plaintiff further testified during trial that since the events that occurred onboard the *Sensation*, she now attends Madison College Police Academy and is studying to become a game warden. D.E. 220-4 at 2:18 - :22. Plaintiff's criminal-justice studies appear to have had a palliative

effect on Plaintiff and to have awakened within her a recognition of the importance of telling the truth while under oath. That revelation occurred in time for Plaintiff to admit during her trial testimony that not all of her prior statements had been truthful. Precisely because of these types of character developments that we hope will occur when minors become adults, minors are not always expected to make decisions with the same level of maturity or understanding that our society demands from adults. Although the Court does not on this basis excuse Plaintiff's earlier actions in the case, the Court finds these considerations relevant to the inquiry into whether Plaintiff ultimately litigated this case in bad faith.

While, when viewed in isolation, Plaintiff's actions in filing this case when she must have known that her most damaging factual allegations were false could justify the imposition of sanctions, under the circumstances present in this case, the Court concludes that a finding of bad faith is not warranted. Plaintiff was a minor at the time of the incident, and Plaintiff, who has recently attained the age of majority, admitted her prior lies and appears to have testified truthfully at the time of trial. In addition, Plaintiff's trial testimony suggests that she has matured and developed a much-needed appreciation for the importance of the truth. Because Plaintiff's trial testimony appears to have corrected the record with regard to her earlier untruthful statements, she ultimately did not "defile" the "very temple of justice." *See Chambers*, 501 U.S. at 46. As the inquiry under the bad-faith standard centers "primarily on the conduct and motive of a party, rather than on the validity of the case," *Rothenberg v. Security Management Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir. 1984), Plaintiff's corrective trial testimony is significant to the determination of whether Plaintiff pursued the case in bad faith.

Nor is this a situation where Defendant has shown that Plaintiff has engaged in a pattern of filing allegedly frivolous lawsuits. *See, e.g., Barash v. Kates*, 585 F. Supp. 2d 1347, 1353 (S.D. Fla.

2006) (court awarded sanctions pursuant to its inherent authority where the plaintiff had committed a fraud on the court and had engaged in extensive prior related litigation). For all of these reasons, the Court concludes that no bad-faith determination is warranted and therefore declines to impose sanctions against Plaintiff.

Moreover, even if the Court were to find that sanctions should be imposed, the record suggests that Plaintiff would have no ability to pay any significant award imposed. This Circuit has stated that "[t]he law . . . is clear that ability to pay should be considered . . . " in determining the amount of any award of sanctions under the Court's inherent powers. *Baker v. Alderman*, 158 F.3d 561, 528 (11th Cir. 1998); *Martin v. Automobili Lamborghini Exclusive*, 307 F.3d 1332, 1337 (11th Cir. 2002). This is so because "sanctions must never be hollow gestures; their bite must be real. For the bite to be real, it has to be a sum that the person might actually pay. A sanction which a party clearly cannot pay does not vindicate the court's authority because it neither punishes nor deters." *Martin*, 307 F.3d at 1337 (citation omitted).

In this case, Plaintiff asserts that she has no means to pay sanctions. Plaintiff supports this argument with documentation showing that she has been awarded need-based financial aid to attend school. D.E. 238. While, in and of themselves, the financial-aid documents that Plaintiff provides fail to demonstrate a true inability to pay, they do reflect an assumed[4] Expected Family Contribution ("EFC") of zero and the award of a $5,500 education grant. D.E. 238 at 6-15. Moreover, Plaintiff testified that she is currently a student and is unemployed. Finally, this Court has already required Plaintiff to pay $4,364.06 in costs. *See* D.E. 243. In view of the fact that Plaintiff is a nineteen-year-old, unemployed student who receives financial aid and has already been ordered to pay more than $4,000 as a result of her involvement in this litigation, it is highly unlikely that Plaintiff has the

---

[4] The EFC of zero is marked with an asterisk that denotes the amount is an "assumption." *See* D.E. 238 at 6.

ability to pay any amount of sanctions. While the Court does not consider this fact in determining whether it should impose sanctions pursuant to its inherent powers, the Court nonetheless notes that, as a practical matter, an order requiring the payment of any sanctions award would likely be a meaningless victory for Defendant.

### *III.  Conclusion*

Accordingly, it is **ORDERED and ADJUDGED** that Defendant's Amended Motion for Sanctions [D.E. 220] is **DENIED**.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 16th day of October 2013.

                                                                        ROBIN S. ROSENBAUM
                                                  UNITED STATES DISTRICT JUDGE

copies:         Counsel of Record